Nancy QUIGLEY,

v.

Jo Anne B. BARNHART,[1] Commissioner of the Social Security Administration.

No. CIV.A.01–11664–RBC.

United States District Court, D. Massachusetts.

Sept. 30, 2002.

---

**1.** Larry B. Massanari, the original defendant in this action, was sued in his official capacity only. On November 9, 2001, Mr. Massanari was succeeded by Jo Anne B. Barnhart as Commissioner of the Social Security Administration. Thus, pursuant to Fed.R.Civ.P. 25(d)(1), Ms. Barnhart has automatically become the defendant in this case. See Fed. R.Civ.P. 25(d)(1) ("When a public officer is a party to an action in his official capacity and during its pendency ... ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party."); see also 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

Albert H. Russell, Jr., Medford, MA, for Nancy E. Quigley, Plaintiff.

George B. Henderson, U.S. Attorney's Office, Boston, MA, for Jo Anne Barnhart, Acting Commissioner of Social Security, Defendant.

*MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO REVERSE DENIAL OF TITLE II BENEFITS (# 11) AND DEFENDANT'S MOTION FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER (# 13)*

COLLINGS, United States Magistrate Judge.

### I. Introduction

In September of 2001, plaintiff Nancy Quigley ("Quigley") filed this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision by defendant Jo Anne B. Barnhart ("Commissioner"), Commissioner of the Social Security Administration ("SSA"), denying her application for Social Security Disability Insurance ("SSDI") benefits. The parties have filed competing motions to reverse (# 11) and to affirm (# 13) the Commissioner's decision, together with memoranda of law in support of their respective positions (## 12, 14). The administrative record of proceedings has also been duly submitted as part

of the Commissioner's answer. In February of 2002, with the parties' consent, this case was referred and reassigned to the undersigned for all purposes including trial and the entry of judgment pursuant to 28 U.S.C. § 636(c).

### II. Procedural History

Quigley has filed a couple of applications for disability insurance benefits, the first one on November 4, 1994. (TR at 291[2]) That initial claim was denied on December 14, 1994, and no further action was taken with respect to it. (TR at 291) Her second application was submitted about nine months later on August 8, 1995 alleging a disability onset date of March 31, 1991. (TR at 291–2) This claim, too, was denied initially and then again upon reconsideration. (TR at 291) On December 26, 1996, Quigley filed a request for a hearing before an Administrative Law Judge ("ALJ") which hearing was scheduled for April 30, 1996. (TR at 291)

Following the hearing the ALJ issued a decision on July 23, 1996 wherein he re-opened the November 4, 1994 claim and "favorably revised" it. (TR at 291) Specifically the ALJ determined that Quigley suffered from "severe major depression and bipolar disorder" such that she was under a disability "during the period March 31, 1991 through January 18, 1996," but, consequent to her "significant medical improvement", she was no longer disabled after January of 1996. (TR at 295–6) No appeal was taken from the ALJ's decision. (TR at 58)

In January, 1997, Quigley again filed applications for disability insurance benefits and supplemental security income payments alleging that she "became unable to

---

**2.** "TR" refers to the transcript of the record of the administrative proceedings filed as part of the defendant's answer.

work because of [her] disabling condition on March 31, 1991." (TR at 276–9) After these applications were denied both initially and on reconsideration (TR at 305–8; 311–6), the plaintiff once more requested a hearing before an ALJ. (TR at 317–8) The administrative hearing was set for, and held on, May 27, 1998. (TR at 321–5; 32) Quigley attended and participated in the administrative hearing.[3] (TR at 34)

In his decision dated November 9, 1998, the ALJ concluded that Quigley's "impairments do not prevent her from performing her past relevant work" and, further, that she "has not been under a disability, as defined in the Social Security Act, at any time from July 24, 1996 through the date of this decision." (TR at 26) On November 30, 1998 the plaintiff requested a review of this hearing decision. (TR at 12–4) When Quigley's request was denied by the Appeals Council on August 3, 2001 (TR at 8–9), the ALJ's decision effectively became the final decision of the Commissioner. The present case seeking review of the Commissioner's decision was timely filed on September 27, 2001.[4]

### III. The Facts

At the time of the administrative hearing in May of 1998 Quigley was fifty-seven years old. (TR at 42) She had completed her high school equivalency and had also received training as a nursing assistant. (TR at 42; 94) She lived in East Hampstead, New Hampshire with her son, his wife and their three children. (TR at 42) Although Quigley had not worked during the two and a half years prior to the hearing (TR at 43), she helped out in the home, doing housework such as washing dishes, sweeping up, and things of that sort, without difficulty. (TR at 44) She testified that she did not go out and get a job because she "shake[s] too much and [she] get[s] too anxious." (TR at 45; 49) The shakiness had started over a year earlier, and it was unclear if it was related to her medications. (TR at 46) Quigley testified that she had regular visits with her doctor every three months and had weekly sessions with her therapist. (TR at 48)

With regard to employment experience, on August 15, 1995 Quigley reported that from 1979 through 1991 she had held a number of jobs including working in the electronics field soldering components, as a nursing assistant, as counter help, and as an inspector at a plastics company. (TR at 94) At the administrative hearing the plaintiff testified that in 1991 she had worked at a plastics company where she had inspected plastic bottles. (TR at 50) She held the job for about a year until she basically walked out. (TR at 51–2) Quigley testified that she could not perform the job at the time of the hearing because she was too nervous, she would not know what she was looking for and she "didn't like standing up constantly." (TR at 52)

In mid-August of 1995 the plaintiff reported that although she had not worked for pay since 1991, she had been doing light housekeeping for a couple in exchange for a room. (TR at 113–4[5]) Quigley provided these housekeeping services from 1991 until at least early 1996 at which

---

3. Also present was a non-attorney representative appointed by Quigley. (TR at 309; 331)

4. As noted, the ALJ's July 23, 1998 decision which determined that Quigley's period of disability ended in January of 1996 was never appealed. Thus, although the plaintiff claims a disability onset date of March, 1991, in fact

the time period at issue in this case is on and after July of 1996. (See TR at 18)

5. There is an indication in the record that in addition to room and board Quigley received $50.00 per week for the housekeeping services that she provided. (See TR at 233)

time she moved in with her son and his family. (TR at 266) During 1995 she also volunteered at the Lakes Region General Hospital. (TR at 157; 164; 266)

While recognizing that the relevant period for the plaintiff's current claims began in July of 1996, for contextual purposes a brief review of her medical history is helpful. Quigley was hospitalized for depression on four occasions, in 1984, 1989, 1990 and 1995. (TR at 123; 149; 159) The July, 1995 hospitalization at the Lakes Region General Hospital in Laconia, New Hampshire resulted consequent to her worsening depression over a period of months that was exacerbated by a recent move and the death of a pet. (TR at 149–50) In an August 16, 1995 psychiatric evaluation, Dr. Andrew Hopkins reported the plaintiff's mood had improved during the hospitalization and that "since discharge, she has generally been doing well although she continues with periods of anxiety and 'shakiness' which especially occurs in groups where she is the focus of attention." (TR at 158) It was further noted that she was "tolerating the medications well with minimal side effects." (TR at 162)

At a September, 1995 visit with Dr. Hopkins, Quigley stated that she continued "to feel somewhat shaky and anxious, especially when she is not busy," but that she was enjoying her volunteer work at the hospital. (TR at 165) She continued to tolerate her medications well with no significant side effects. (TR at 165) Four months later, the medical note is much the same: Quigley "reporte[d] that she has been doing fairly well," her "[a]nxiety has been under fairly good control" and she had no significant side effects from her medications. (TR at 266)

After moving in with her son in February, in March of 1996 the plaintiff advised her new clinical social worker that she felt "shaky & nervous." (TR at 268) Quigley was assessed as having a guarded attitude, a constricted affect and a depressed and worried mood. (TR at 270) On April 20, 1996, the plaintiff was described as being "quite concerned" about her Social Security benefits and "anxious." (TR at 274)

After a psychiatric consult on April 19, 1996, Dr. Robert Palombo reported that the plaintiff was "basically stable" although she felt "anxious at times and slightly tremulous." (TR at 402) In a psychiatric report the following month Dr. Palombo related that Quigley stated "her mood is fairly good" and noted that "[s]he appears to have a slight intention tremor." (TR at 403) On July 2, 1996, Dr. Jonathan Schwartz reported that the plaintiff "denie[d] prior history of anxiety, but she describe[d] weekly panic attacks since [her hospitalization]. They are accompanied by heart racing and a feeling that she needs to run away from wherever she is." (TR at 405) Dr. Schwartz ordered a change in her medications. (TR at 405)

In August, 1996, Quigley was observed to be "doing well" with a little brighter affect. (TR at 392) The clinical social worker also reported at that time that the plaintiff had joined a bowling league. (TR at 392) By October of 1996 Quigley was described as "doing very well," "feeling good" but still experiencing "some shakiness." (TR at 394)

Dr. Schwartz' psychiatric report dated January 8, 1997 recites the plaintiff's report of "occasional periods of shakiness, with internal anxiety and physical shaking of her hands" but that her "holidays have been quite good." (TR at 409). Notes from her psychotherapy session on January 14, 1997 reveal that the plaintiff was doing "ok" albeit with continued shakiness, but that she had begun to vomit frequently. (TR at 396) About three weeks later Quigley reported feeling stressed by fami-

ly issues and upset by her boyfriend's drinking habits. (TR at 397)

Her clinical social worker's notes from the March, 1997 session indicate that the plaintiff was continuing to vomit after eating and that she was strongly urged to see a doctor. (TR at 398) Quigley also discussed being upset about certain family dynamics and how she "still shakes frequently—does not feel she can work." (TR at 398) Dr. Swartz reports following his April 9, 1997 psychiatric consultation with the plaintiff that she stated that "she is feeling much as she did on last visit" although "[s]he does note that she continues to be shaky, and has begun to vomit again in the evening when she lies down for bed." (TR at 410) No changes were made in her medications as a result of that session. (TR at 410)

On July 18, 1997 Quigley underwent an evaluation by Rickey B. Silverman, Ph. D. (TR at 419) Dr. Silverman observed that the plaintiff "is anxious and sometimes irritable, but she states she does not feel as depressed as before since she has been on medication." (TR at 421) Quigley was seemingly "a bit foggy, with trouble remembering dates," but she was oriented as to time, space and person and her memory, attention and concentration were unimpaired. (TR at 421) The plaintiff's description of her typical day was as follows:

> She gets up in the morning and drives her friend's van to jobs for him. She showers and gets dressed and sometimes has breakfast. She states she sits in the van and reads magazines or plays solitaire. She sometimes has lunch and sometimes she does not. If there are no more jobs that her friend is doing, she will putter around in her house. Then she will wash dishes, make coffee and get something to eat. She does not food shop but does cook dinner once a week or so. She states she does not use public transportation, although she does drive. She does pay bills, pays the rent and helps maintain her house. She takes care of her teeth and showers, etc., daily and takes care of grooming and hygiene on a regular, daily basis.

TR at 422.

Dr. Silverman further related that Quigley "feels she could not handle work because she is irritable." (TR at 422)

Subsequent to Dr. Silverman's evaluation, in late July of 1997 Michael A. Schneider, Psy. D., a psychological reviewer for the state (TR at 429) in connection with her January, 1997 disability application (TR at 305), reached the following conclusion based upon the documentation in Quigley's file:

> [I]t appears that the claimant does have the ability to understand, remember, and carry out short and simple instructions for extended periods of time without one-to-one supervision. She is able to perform such activities within a schedule and complete a normal work-week free from an unreasonable number of disruptions to pace due to her psychological problems. In a low stress, low pressure environment with only mild criticism from supervisors, she can interact appropriately with supervisors and peers. She is able to accommodate to changes in such a work setting. More than likely because of her dependence, she would not be able to independently realistically set goals, however.

TR at 429.

In the August 11, 1997 initial rejection of Quigley's January 1997 application for benefits (TR at 305–6), the SSA explained that after considering the medical reports that:

> The medical evidence shows that you have a history of bipolar disorder and receive treatment through Center For Life Management. A recent evaluation

was performed to supplement information provided by CLM. The report of this evaluation supports the diagnosis of bipolar disorder and adds a personality disorder diagnosis, as well.

Review of all documentation in file (sic) suggests that despite somewhat isolative behavior, you have the ability to understand, remember, and carry out short and simple instructions for extended periods of time without one-to-one supervision. You are able to perform activities within a schedule and complete a normal work week without an unreasonable number of disruptions to pace. You would perform best in a low stress, low pressure work setting only with mild criticism from supervisors. In such a setting you will be capable of getting along with others, and adapt to changes.

We realize that these restrictions would prevent you from returning to work that you have performed in the past, but they should not prevent you from performing such work as a routing clerk, a marker in the retail trade, or an office helper.

TR at 306.

In his August 13, 1997 psychiatric report Dr. Schwartz wrote that Quigley "has generally been stable, and clearly seems to feel a bit less anxious." (TR at 414) He also noted that the vomiting she was experiencing was determined to have been caused by a hiatal hernia and since she had started taking Prilosec, she no longer had any nausea or vomiting. (TR at 414) During this appointment Quigley discussed the fact that she was having some intermittent trouble sleeping and that she experienced some irritability after taking her afternoon medication. (TR at 414)

On August 21, 1997 the plaintiff underwent a colonscopy and polypectomy to remove a non-malignant sigmoid polyp. (TR at 440–7)

On August 25, 1997 Quigley filed her request for reconsideration of the initial denial of her January 1997 application for benefits. (TR at 313–4) When the plaintiff's case was again reviewed by a state psychologist, Craig E. Stenslie, Ph.D., in early December of 1997 in connection with the request for reconsideration, Dr. Stenslie reached the following conclusions:

[T]he following statements can be made regarding [Quigley's] functional capacities: She is able to understand, remember and carry out short and simple instructions; she is able to due (sic) some problems with concentration. She is able to maintain attention for two hours. She is able to sustain an ordinary routine without special supervision. Due to some distractibility, she is able to work in coordination with others only in a relatively isolated work station, lest she becomes distracted. She is able to complete a normal workday and workweek without undue interruption. She is able to respond appropriately to criticism from supervisors if such 'criticism is kept mild, this limitation based on her difficulties interpersonally and a tendency to withdraw. She is able to respond appropriately to changes in the work setting in a low-stress environment as addressed above.

TR at 460.

With respect to her medical problems at that time, on December 31, 1997, Dr. Burton Albert determined that her "mild diverticulosis of the sigmoid, status post removal of benign sigmoid polyp" and "involuntary vomiting after eating of questionable etiology" did not rise to the level of a recognized impairment, "nor would they interfere with a full work capacity currently." (TR at 470)

In the January 6, 1998 denial of Quigley's request for reconsideration of her

January 1997 application for benefits (TR at 307–8), the SSA explained that:

> Your claim has been reviewed by a different examiner and by a different doctor. They have decided that you are not disabled.

> \* \* \* \* \* \*

> The updated medical evidence shows that the prior decision was correct.

> The records show that you do have mild diverticulitis of the sigmoid, status post removal of a benign sigmoid polyp and you have involuntary vomiting after eating of questionable ideology, probably non-organic in origin. Also, you have a bipolar disorder, which is in remission and an anxiety disorder.

> It has been determined none of your impairments meet the Social Security Program criteria. You are considered capable of performing short and simple routine tasks at an isolated work station in a low-stress setting, with only mild criticism from your supervisors.

> We realize that these restrictions would prevent you from returning to your past relevant work, but they should not prevent you from performing other routine, low-stress jobs as found in the national economy.

TR at 308.

In his May 4, 1998 psychiatric report Dr. Schwartz wrote that Quigley felt she was under increasing stress due to her son's impending graduation and marriage but, apart from "some physical shaking" she was overall stable. (TR at 474) That same date Dr. Schwartz completed a medical assessment of ability to do work-related activities (mental) form incorporating these conclusions: Quigley had a good ability to relate to co-workers; deal with the public; interact with supervisors; understand, remember and carry out simple job instructions; maintain her personal appearance and relate predictably in social situations. (TR 476–7) The plaintiff was seen as having a fair ability to follow work rules; use judgment; deal with work stresses; function independently; maintain attention/concentration; understand, remember and carry out complex job instructions; understand, remember and carry out detailed but not complex job instructions; behave in an emotionally stable manner; and demonstrate reliability. (TR at 476–7)

### IV. The Standard Of Review

Title 42 U.S.C. § 405(g) provides, in relevant part:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...

The Court's role in reviewing a decision of the Commissioner under this statute is circumscribed:

> We must uphold a denial of social security disability benefits unless "the Secretary has committed a legal or factual error in evaluating a particular claim." *Sullivan v. Hudson,* 490 U.S. 877, 885, 109 S.Ct. 2248, 2254, 104 L.Ed.2d 941 (1989). The Secretary's findings of fact are conclusive if sup-

ported by substantial evidence. See 42 U.S.C. § 405(g); see also *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

*Manso–Pizarro v. Secretary of Health and Human Services*, 76 F.3d 15, 16 (1st Cir. 1996); see also *Reyes Robles v. Finch*, 409 F.2d 84, 86 (1st Cir.1969) ("And as to the scope of court review, 'substantial evidence' is a stringent limitation.")

The Supreme Court has defined "substantial evidence" to mean " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir.1991). It has been explained that:

> In reviewing the record for substantial evidence, we are to keep in mind that "issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary." The Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts. We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.

*Lizotte v. Secretary of Health and Human Services*, 654 F.2d 127, 128 (1st Cir.1981) quoting *Rodriguez v. Secretary of Health and Human Services*, 647 F.2d 218, 222 (1st Cir.1981); *Geoffroy v. Secretary of Health and Human Services*, 663 F.2d 315, 319 (1st Cir.1981) ("In any event, whatever label the parties or the court

ascribe to the procedure used to review the Secretary's decision, statute and long established case law make clear that the court's function is a narrow one limited to determining whether there is substantial evidence to support the Secretary's findings and whether the decision conformed to statutory requirements." (citations omitted)).

■ In other words, if supported by substantial evidence, the Commissioner's decision must be upheld even if the evidence could also arguably admit to a different interpretation and result. Lastly,

> Even in the presence of substantial evidence, however, the Court may review conclusions of law, *Slessinger v. Sec'y of Health & Human Servs.*, 835 F.2d 937, 939 (1st Cir.1987) (per curiam) (citing *Thompson v. Harris*, 504 F.Supp. 653, 654 [D. Mass.1980]), and invalidate findings of fact that are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts," *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

*Musto v. Halter*, 135 F.Supp.2d 220, 225 (D.Mass.2001).

### V. Discussion

■ It is perhaps best to begin with an overview of the legal framework. The burden is on the plaintiff to prove that she is under a disability in order to establish her right to disability insurance benefits. *Bowen v. Yuckert*, 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). As defined in the Social Security Act, disability means the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not *less than 12 months.*

Title 42 U.S.C. §§ 416(I)(1) and 423(d)(1)(A).

The relevant statute further provides that:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

Title 42 U.S.C. § 423(d)(2).

█ Thus as the statute makes plain, a mental or physical impairment alone is not enough. To be entitled to benefits, a claimant also must be unable to engage in substantial gainful work as a result of that impairment. See, e.g., *McDonald v. Secretary of Health and Human Services*, 795 F.2d 1118, 1119–20 (1st Cir.1986); *Goodermote v. Secretary of Health and Human Services*, 690 F.2d 5, 6 (1st Cir.1982) ("Thus, 'disability' under this statute has a 'medical' part, concerning the nature and severity of a claimant's impairment, and a 'vocational' part, concerning the availability of suitable work."); *Thomas v. Secretary of Health and Human Services*, 659 F.2d 8, 9 (1st Cir.1981).

In reaching his decision, the ALJ in the instant case appropriately followed the five step evaluation process established by SSA regulations. See 20 C.F.R. § 404.1520; *Mills v. Apfel*, 244 F.3d 1, 2 (1st Cir.2001),

cert. denied, —— U.S. ——, 122 S.Ct. 822, 151 L.Ed.2d 704 (2002); *Goodermote*, 690 F.2d at 6–7. The applicable regulation provides as follows:

§ 404.1520 Evaluation of disability in general.

(a) Steps in evaluating disability.

We consider all evidence in your case record when we make a determination or decision whether you are disabled. When you file a claim for a period of disability and/or disability insurance benefits or for child's benefits based on disability, we use the following evaluation process. If you are doing substantial gainful activity, we will determine that you are not disabled. If you are not doing substantial gainful activity, we will first consider the effect of your physical or mental impairment; if you have more than one impairment, we will also consider the combined effect of your impairments. Your impairment(s) must be severe and meet the duration requirement before we can find you to be disabled. We follow a set order to determine whether you are disabled. We review any current work activity, the severity of your impairment(s), your residual functional capacity, your past work, and your age, education, and work experience. If we can find that you are disabled or not disabled at any point in the review, we do not review your claim further. Once you have been found entitled to disability benefits, we follow a somewhat different order of evaluation to determine whether your entitlement continues, as explained in § 404.1594(f).

(b) If you are working.

If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled regardless of your medical condition or

your age, education, and work experience.

(c) You must have a severe impairment. If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience. However, it is possible for you to have a period of disability for a time in the past even though you do not now have a severe impairment.

(d) When your impairment(s) meets or equals a listed impairment in Appendix 1.

If you have an impairment(s) which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age, education, and work experience.

(e) Your impairment(s) must prevent you from doing past relevant work.

If we cannot make a decision based on your current work activity or on medical facts alone, and you have a severe impairment(s), we then review your residual functional capacity and the physical and mental demands of the work you have done in the past. If you can still do this kind of work, we will find that you are not disabled.

(f) Your impairment(s) must prevent you from doing any other work.

(1) If you cannot do any work you have done in the past because you have a severe impairment(s), we will consider your residual functional capacity and your age, education, and past work experience to see if you can do other work. If you cannot, we will find you disabled.

(2) If you have only a marginal education, and long work experience (i.e., 35 years or more) where you only did arduous unskilled physical labor, and you can no longer do this kind of work, we use a different rule (see § 404.1562).

20 C.F.R. § 404.1520.

The ALJ found that Quigley was last engaged in substantial gainful employment in March, 1991, that she had "impairments which cause significant vocationally relevant limitations," and that her impairments do not meet the Appendix 1 criteria for severity. (TR at 19–20) The ALJ's analysis stopped at step four when he determined that the plaintiff "retain[ed] the residual functional capacity to return to past work" and thus was not entitled either to disability insurance benefits or supplemental security income payments. (TR at 24–5)

Quigley challenges the ALJ's decision on three grounds, each of which shall be addressed seriatim.

### A. The Psychological Assessments by Drs. Schneider and Stenslie

First the ALJ is said to have erred when he purportedly ignored the psychological assessment completed by Dr. Schneider in July, 1997 and the one completed by Dr. Stenslie in December, 1997 in reaching the conclusion that Quigley could return to work that she had performed in the past. The plaintiff is partially incorrect in her factual assertion: The ALJ did specifically reference the assessment of the "State agency medical consultant" made at the first level of administrative consideration, to wit, that of Dr. Schneider, and also the assessment made by the medical consultant on reconsideration, Dr. Albert, in his decision. (TR at 24) It is true, however, that the ALJ did not discuss the psychological assessment made by Dr. Stenslie on reconsideration. In large measure that second assessment reflects the first one made by Dr. Schneid-

er, although Dr. Stenslie did add that the plaintiff should work in "a relatively isolated work station." (TR at 460) This restriction could well be viewed as impacting Quigley's ability to perform her past work of, for example, a counter helper.

It is the policy of the SSA that "[f]indings of fact made by State agency medical and psychological consultants...regarding the nature and severity of an individual's impairments(s) must be treated as expert opinion evidence" and "[a]dministrative law judges and the Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions." (# 12, Exh. 2, SSR–96–6p) The pertinent regulations provide that:

> ...[T]he administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do for any opinions from treating sources, non-treating sources, and any other nonexamining sources who do not work for us.

20 C.F.R. 404.1527(f)(2)(ii) (2000).[6] (Emphasis supplied)

Since Dr. Stenslie's assessment was not mentioned in the ALJ's decision, it is unknown whether it was overlooked or considered and disregarded. In either case, the assessment is plainly relevant to the ALJ's determination of Quigley's residual functional capacity. It is imperative that the ALJ take the medical evidence into account and explain the weight he affords it in making his decision. See, e.g., *Nguyen v. Callahan*, 997 F.Supp. 179, 182

---

(D.Mass.1998) (citing cases). The failure to do so was error.

### B. Earlier Determinations Made By The SSA

■ These medical assessments by Drs. Schneider and Stenslie are to be distinguished from the earlier determinations made by the SSA on the plaintiff's claim. Although the SSA both in the initial review and on reconsideration determined that the plaintiff was not disabled (hence the request for a hearing before an ALJ), the agency did state that restrictions imposed by Quigley's condition "would prevent [her] from returning to work that [she] had] performed in the past." (TR at 306 and 308)

These conclusions are not treated in the same manner as "opinions" or "findings of a State agency medical or psychological consultant" which are to be considered as set forth in 20 C.F.R. 404.1527(f). Rather, consideration of these denials which concluded that the plaintiff could not return to her former work are entitled to some evidentiary weight. Under 20 C.F.R. 404.1512(b):

> (b) What we mean by "evidence." Evidence is anything you or anyone else submits to us or that we obtain that relates to your claim. This includes, but is not limited to:
>
> \*   \*   \*   \*   \*   \*
>
> (5) Decisions by any governmental or nongovernmental agency about whether you are disabled...

The same is true for "information from other sources" which would include employers. 20 C.F.R.404.1512(b)(4).[7]

---

**6.** Another regulation, 20 C.F.R. § 416.927(f)(2)(ii), is virtually identical.

**7.** "Although determinations of disability made by other entities are not binding on the SSA, 20 C.F.R. § 404.1504 (1990), such a finding is particularly relevant to [plaintiff's] ability to

perform her past work and is entitled to some weight, see *Turpin v. Bowen*, 813 F.2d 165, 172 (8th Cir.1987)." *Kirby v. Sullivan*, 923 F.2d 1323, 1327 (8th Cir.1991). In Kirby, the ALJ was faulted for not verifying whether Kirby had been placed on permanent medical

However, unlike the directives with respect to medical opinions, there is no explicit requirement that the ALJ make findings regarding every piece of evidence that is entitled to weight. Thus, the Court would not remand a case because an ALJ failed to mention such evidence. After all, there is a presumption that the ALJ has considered all of the evidence before him. However, because a remand in this case is necessary, it would be advisable for the ALJ to discuss these earlier determinations upon remand, and if he disagrees with them, to explain the reasons why. Although the ALJ is not bound by the earlier determinations and is free to give them the weight he deems appropriate, failing to mention them and to explain the weight he gives them leads to arguments such as those advanced in this case that the earlier determinations were simply ignored.

### C. Failure to Develop the Record as to the Requirements of Past Employment

■■■ Next, Quigley complains that the ALJ did not adequately develop the record with respect to the particulars of her past work and how her impairments affect her ability to perform those jobs. As explained by the Eighth Circuit,

Step four of the sequential analysis used in Social Security disability determinations requires the ALJ to review the claimant's residual functional capacity and the physical and mental demands of the claimant's past work. See 20 C.F.R. § 404.1520(e) (1990). "[T]he ALJ has a duty to fully investigate and make explicit findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant herself is capable of doing before he determines that she is able to perform her past relevant work."

*Nimick v. Secretary of Health & Human Servs.*, 887 F.2d 864, 866 (8th Cir. 1989) (emphasis in original). These findings require evidence of the "actual functional demands and job duties of a particular past relevant job" or the "functional demands and job duties of the occupation as generally required by employers throughout the national economy." See id. n. 2 (quoting S.S.R. No. 82–61, Soc.Sec.Rep. 836, 838 (West 1983)). An SSA ruling interpreting the regulations stated:

The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.

S.S.R. No. 82–62, Soc.Sec.Rep. 809, 812 (West 1983).

*Kirby*, 923 F.2d at 1326.

Quigley's point is well taken.

The ALJ found that "[i]n her past work as a packager in plastics or counter worker, the claimant was not required to lift more than 50 pounds, or work in a stressful environment with more than routine tasks;" that "[t]he claimant's past relevant work as a packager in plastics or counter worker did not require the performance of work functions precluded by her medically determinable impairments;" and that "[t]he claimant's impairments do not prevent her from performing her past relevant work." (TR at 25–6) The Commissioner concedes that "[t]he record does not

disability by her former employer, the employer being the "other entity." Id.

contain any clear description of the plaintiff's work as a counter helper." (# 14 at 9) Indeed, there was no inquiry undertaken at the administrative hearing with respect to this prior work at all and a dearth of information about it in the written record. Absent any development of the particulars of this former job, it is impossible for the ALJ to have undertaken the analysis required in order to decide whether, with her residual functional capacity, Quigley was able to perform the work as a counter helper.

■ Nor did the ALJ adequately investigate the parameters and details of the "packager in plastics" job. At the administrative hearing, there was a colloquy with respect to the plaintiff's position at Contact Plastics. Quigley testified that she "inspected plastic bottles, like little cotton bottles or, you know, oil bottles" which entailed "just look[ing] up and you would be checking for holes or, you know, so when they put milk in it wouldn't leak." (TR at 50–1) Although she supposedly was unable to do‘ the job, i.e., she was putting rejects in the boxes that were to be shipped to customers, the plaintiff explained that the company had kept her employed because her son told the director of hiring that she was in a state of depression. (TR at 51–2) More fully describing the position, Quigley testified that:

> It was a stand-up job and you stayed there until break time. You didn't leave it because the plastic bottles kept going in this big bin so you had to keep up with it.

> \*     \*     \*     \*     \*     \*

> I went through a lot of anxiety like just, you know, throwing these bottles out. I would control it but I felt that I just wanted to walk out or I just wanted to scream. I don't know what I was doing and I don't know how to ask anybody. I was too embarrassed to go to the supervisor and say we need to talk because I don't understand what I was looking for.

TR at 52–3.

The plaintiff testified that she was too nervous and anxious to perform the bottle inspection job. (TR at 52–3)

In her memorandum, Quigley contends that the ALJ did not sufficiently inquire into, and make explicit findings regarding, the demands of this job particularly the mental/emotional component and requisite manual dexterity. (# 12 at 10–1) The Court agrees that the physical and mental demands of the bottle inspector position must be more fully fleshed out so that they can be effectively compared with Quigley's physical and mental residual functional capacity. This is especially so in view of Dr. Stenslie's conclusion that Quigley "[d]ue to some distractability, . . . is able to work in coordination with others only in a relatively isolated work station, lest she become distracted." (TR at 460)

Because the ALJ did not sufficiently develop the record with respect to Quigley's relevant past employment, his conclusion that, given her residual functional capacity, she can perform those prior jobs is not supported by substantial evidence. *Kirby*, 923 F.2d at 1327.[8]

---

8. The plaintiff's final point requires only minimal discussion. Quigley claims that the ALJ should have called upon vocational resources to aid him in determining "the stress level and complexity of the work" involved in her prior jobs, and that his failure to do so was legal error. (# 12 at 13) The plaintiff cites the Eighth Circuit's decision in *Sanders v. Sulli-*

*van*, 983 F.2d 822 (8th Cir.1992) as support for her contention. The Saunders case is inapposite, however, in that it deals not with step four of the evaluative process, but rather with step five when the burden shifts to the Commissioner to establish that there are jobs in the economy that the claimant can perform. *Sanders*, 983 F.2d at 823–4. As Quig-

### VI. Conclusion and Order

For the reasons stated it is ORDERED that the Plaintiff's Motion To Reverse Denial Of Title II Benefits (# 11) be, and the same hereby is, ALLOWED and Defendant's Motion For Order Affirming The Decision Of The Commissioner (# 13) be, and the same hereby is, DENIED. It is FURTHER ORDERED that the decision of the Commissioner is VACATED and the case is REMANDED to the Commissioner for proceedings consistent with this Memorandum and Order.

ley has cited no authority on point for her proposition that vocational expertise was required in the circumstances of this case, her argument is unpersuasive.